Rebecca L. Davis (State Bar No. 271662)
Kylah M. Staley (State Bar No. 347756)*
LOZEAU DRURY LLP
1939 Harrison St., Suite 150
Oakland, CA 94612
Phone: (510) 836-4200
Email: rebecca@lozeaudrury.com
        kylah@lozeaudrury.com

*admission to Eastern District pending

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, <br><br> Plaintiff, <br><br> vs. <br><br> MACRO PLASTICS, INC.; and IPL, INC., <br><br> Defendant. | Case No. _____ <br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES <br><br> (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

COMPLAINT                                    1

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA" or "Plaintiff"), a California nonprofit corporation, by and through its counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.    On September 8, 2025, Plaintiff provided notice of Defendants' violations of the Act, and of Plaintiff's intention to file suit against Defendants, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, San Francisco Bay Region ("Regional Board"); the United States Attorney General for the United States Department of Justice; and to Defendants, as required by the Act, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of CSPA's notice letter is attached as Exhibit A, and is incorporated by reference.

3.    More than sixty days have passed since notice was served on Defendants and the State and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.

This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.    Venue is proper in the Eastern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.    INTRODUCTION

5.    This Complaint seeks relief for Defendants' discharges of polluted storm water and related monitoring violations from Defendants' industrial facility located at 2250 Huntington Drive, Fairfield, California ("Facility"). These discharges and related sampling, procedural and planning omissions are in violation of the Act and National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ, as renewed by Water Quality Order 2015-0057-DWQ, and as further amended on November 6, 2018 ("General Permit"). Defendants' violations of the discharge, treatment technology, monitoring, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

6.    Storm water runoff is one of the most significant sources of water pollution in the nation and has been recognized as a leading cause of significant and cumulative harmful impacts to the water quality of San Francisco Bay and its tributaries. With every significant rainfall event, millions of gallons of polluted rainwater, originating from industrial operations such as the Facility, pour into storm drains, local tributaries, Suisun Bay, and San Francisco Bay. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year. The Regional Board has stated that storm water pollution is the major source of pollution entering San Francisco Bay and Bay area surface waters each year.

7.    McCoy Creek, Laurel Creek, the Suisun Marsh, Grizzly Bay, and Suisun

COMPLAINT                                    3

Bay (collectively, the "Receiving Waters") are ecologically robust areas and important habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities. The public's use of the Receiving Waters for water contact sports exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreation and aesthetic opportunities, such as wildlife observation are also impaired by polluted discharges into Suisun Bay area waters.

8.      The EPA 303(d) List of Water Quality Limited Segments lists the Suisun Marsh as impaired for dissolved oxygen, nutrients, salinity, chlorides, and mercury. *See* Final 2018 California Integrated Report, Appendix A: 2018 303(d) List of Impaired Waters, available at: https://www.waterboards.ca.gov/water_issues/programs/water_quality_assessment/2018_integrated_report.html. Suisun Bay is impaired for PCBs, chlordane, dieldrin, selenium, dioxin, invasive species, furan compounds, DDT, and mercury. *Id*. The Draft California 2024 Integrated Report's 303(d) List of Water Quality Limited Segments also plans to list the Suisun Marsh as impaired for temperature. *See* Draft 2024 California Integrated Report, Appendix A: Recommended 2024 303(d) List of Impaired Waters, available at: https://www.waterboards.ca.gov/water_issues/programs/water_quality_assessment/2024-integrated-report.html.

9.      Industrial facilities, like Defendants', which are discharging polluted storm water and non-storm water, contribute to the impairment of the Receiving Waters, and aquatic-dependent wildlife. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

## III.    PARTIES

10.    Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Berkeley, California. CSPA's members live and/or recreate in and around waters of the San Francisco Bay, including the Receiving Waters. CSPA is dedicated to the preservation, protection, and defense of the environment, the wildlife, and the natural resources of all waters of California. To further these goals, CSPA actively seeks federal and state agency implementation of the Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

11.    Members of CSPA, including citizens, taxpayers, property owners, and residents, live, work, and travel near, and recreate in and near the Receiving Waters into which Defendants discharge pollutants. CSPA members use and enjoy San Francisco Bay and its tributaries, including the Suisun Bay, for recreational, educational, scientific, conservation, aesthetic, spiritual, and other purposes. For example, CSPA members use those areas to fish, boat, kayak, bird watch, view wildlife, and engage in scientific study including monitoring activities, among other things. Defendants' discharges of storm water containing pollutants threaten or impair each of these uses or contribute to such threats and impairments. Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Act and the General Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendants' activities.

12.    Continuing commission of the acts and omissions alleged below will irreparably harm Plaintiff and one or more of its members, for which harm they have no plain, speedy, or adequate remedy at law. The relief sought herein will redress the harms to Plaintiff caused by Defendants' activities.

13.    CSPA brings this action on behalf of its members. CSPA's interest in reducing Defendants' discharges of pollutants into the Receiving Waters and requiring Defendants to comply with the requirements of the General Permit are germane to its purposes. Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of CSPA.

14.    Defendant MACRO PLASTICS, INC. is a California corporation. On information and belief, Macro Plastics, Inc. owns and/or operates the Facility.

15.    On information and belief, Macro Plastics, Inc. is also known as IPL Macro.

16.    Defendant IPL, INC. is a Canadian company. On information and belief, Macro Plastics, Inc. is owned by IPL, Inc.

17.    On information and belief, IPL, Inc. owns and/or operates the Facility.

## IV.    STATUTORY BACKGROUND

### Clean Water Act

18.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

19.    The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

20.    The term "pollutant" includes "dredged spoil, solid waste… rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

21.    Section 402(p) of the Act establishes a framework for regulating

COMPLAINT                                        6

municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

22.    The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. S*ee* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The Act requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

23.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

24.    Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

25.    Defendant is a "person" within the meaning of Section 502(5) of the Act. *See* 33 U.S.C. § 1362(5).

26.    A third-party enforcement action for injunctive relief is authorized under Section 505(a) of the Act. *See* 33 U.S.C. § 1365(a).

27.    Each separate violation of the Act subjects the violator to a penalty of up to $68,445 per day per violation for all violations. *See* 33 U.S.C. §§ 1319(d) and

COMPLAINT                                          7

1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

28.     Section 505(d) of the Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys', experts', and consultants' fees.

**General Permit**

29.     The State Board elected to issue a statewide general permit for industrial storm water discharges ("General Permit"). The State Board originally issued the General Permit on or about November 19, 1991. The State Board modified the General Permit on or about September 17, 1992. The State Board reissued the General Permit on or about April 17, 1997, and again on or about April 1, 2014, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). On November 6, 2018, the General Permit was further amended to include additional effluent limitations and numeric action levels to be applied to industrial permittees that discharge storm water to waters that have been identified as impaired pursuant to Section 303(d) of the Act, 33 U.S.C. § 1313(d), including the Receiving Waters for, among other things, zinc, copper, and lead.

30.     In order to discharge storm water lawfully in California, industrial facilities must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

31.     The General Permit contains several prohibitions. Effluent Limitation V.A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. General Permit § V.A. Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. General Permit § III.C.

Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. General Permit § VI.B. Receiving Water Limitation VI.A and Discharge Prohibition III.D of the General Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. General Permit §§ VI.A, III.D

32.    In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet. Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI"). Dischargers have been required to file NOIs since March 30, 1992.

33.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards. The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. *See* General Permit, § X.C. These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates. To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, § X.B. Failure to develop or implement an adequate SWPPP, or update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet §

I(1).

34.     Sections X.D-I of the General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of industrial materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges. The General Permit requires that all dischargers develop and implement a set of minimum BMPs (which are mostly non-structural BMPs) as well as any advanced BMPs (which are mostly structural) as necessary to achieve BAT/BCT, which serve as the basis for compliance with the General Permit's technology-based effluent limitations. *See* General Permit § X.H. The General Permit requires a comprehensive assessment of potential pollutant sources, specific BMP descriptions; and a BMP summary table identifying each identified area of industrial activity, the associated industrial pollutant sources, the industrial pollutants, and the BMPs being implemented. *See* General Permit §§ X.G.2, 4-5. Section X.E of the General Permit requires that the SWPPP map depict, *inter alia*, all storm water discharge locations.

35.     The General Permit requires dischargers to implement and maintain, to the extent feasible, all of the following minimum BMPs in order to reduce or prevent pollutants in industrial storm water discharges: good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, an employee training program, and quality assurance and record keeping. *See* General Permit, § X.H.1. Failure to implement all of these minimum BMPs is a violation of the General Permit. *See* General Permit Fact Sheet § I(2)(o).

36.     The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs

COMPLAINT                                    10

necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs. *See* General Permit, § X.H.2. Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit. *Id*. The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table. *See* General Permit § X.H.4-5.

37. A facility must "ensure that the SWPPP identifies and justifies each minimum BMP or applicable advanced BMP not being implemented at the facility because they do not reflect best industry practice considering technological availability and economic practicability and achievability." General Permit, § X.H.4.b. A facility's SWPPP must also identify where the minimum BMPs in different areas of the facility will not adequately reduce the pollutants in the facility's storm water dischargers and identify advanced BMPs for those areas. General Permit § X.G.2. A Facility's BMPs must, at all times, be robust enough to meet the requirement of the General Permit and of 33 U.S.C. § 1342(p)(3)(A) that all discharges associated with industrial activities be subjected to BAT and BCT. General Permit §§ V.A, I.A.1, I.D.31-32.

38. The General Permit requires facility operators to develop and implement an adequate Monitoring Implementation Plan for visual observations and for the sampling and analysis of storm water discharges. *See* General Permit, §§ X.I, XI. The primary objective of such monitoring is to both observe and to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations. Adequate monitoring and reporting ensure that BMPs are effectively reducing and/or eliminating pollutants at a facility, and are evaluated and revised whenever appropriate to ensure compliance with the General Permit.

COMPLAINT                                  11

39.     Under the General Permit, facilities must analyze storm water samples for total suspended solids ("TSS"), O&G, pH, "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, " "[a]dditional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs based on the assessment in Section X.G.2.a.ix," and additional parameters applicable based on a facility's Standard Industrial Classification ("SIC") code. General Permit, § XI.B.6.

40.     Facilities are required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event. General Permit, § XI.A. The General Permit requires each discharger to maintain records of all of the visual observations required by the Permit. General Permit, § XI.A.3.

41.     Section XI.B.2 of the General Permit requires that dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30).  However, Section XI.B.3 of the General Permit requires that dischargers that are part of a compliance group collect and analyze storm water samples from one QSE within the first half of each reporting year and one QSE within the second half of each reporting year. Storm water discharges trigger the sampling requirement under the General Permit when they occur during facility operating hours and are preceded by 48-hours without storm water discharge. General Permit, § XI.B. A sample must be collected from each discharge point at the facility within four hours of the start of the discharge or the start of facility operations if the discharge occurs within the previous 12-hour period. General Permit, § XI.B.5.

42.     The General Permit requires dischargers to conduct visual observations at

COMPLAINT                                                12

the same time sampling occurs at a discharge location. General Permit, § XI.A.2. "The Discharger shall visually observe and record the presence or absence of floating and suspended materials, oil and grease, discolorations, turbidity, odors, trash/debris, and source(s) of any discharged pollutants." *Id*., § XI.A.2.c.

43.    The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, § XV. Per Section XV.F of the General Permit, a facility's Annual Evaluation must include "[a] review and effectiveness assessment of all BMPs for each area of industrial activity and associated potential pollutant sources to determine if the BMPs are properly designed, implemented, and are effective in reducing and preventing pollutants in industrial storm water discharges and authorized NSWDs." After conducting the Annual Evaluation, "[t]he Discharger shall revise the SWPPP, as appropriate, and implement the revisions within 90 days of the Annual Evaluation." *Id*. The General Permit then requires that a Discharger submit an Annual Report which includes the date of the Annual Evaluation as well as "[a]n identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year." General Permit § XVI.

44.    The General Permit does not provide for any mixing zones by dischargers. The General Permit does not provide for any receiving water dilution credits to be applied by dischargers.

**Special Requirements – Plastic Materials**

45.    The General Permit contains "Special Requirements" for facilities that handle Plastic Materials. General Permit § XVIII. Plastic Materials include "virgin and recycled plastic resin pellets, powders, flakes, powdered additives, regrind, dust, and other similar types of preproduction plastics with potential to discharge or migrate

COMPLAINT                                    13

off site." General Permit Findings, p.69.

46.   The General Permit requires facilities that handle Plastic Materials to include additional information in their SWPPPs and implement specific BMPs to eliminate discharges of plastic in storm water.

47.   At a minimum, Plastics Facilities must implement and include the following measures in their SWPPP:

a. Containment systems at each on-site storm drain discharge location down gradient of areas containing plastic material. The containment system shall be designed to trap all particles retained by a 1mm mesh screen, with a treatment capacity of no less than the peak flow rate from a one-year, one-hour storm.

b. When a containment system is infeasible, or poses the potential to cause an illicit discharge, the facility may propose a technically feasible alternative BMP or suite of BMPs. The alternative BMPs shall be designed to achieve the same or better performance standard as a 1mm mesh screen with a treatment capacity of no less than the peak flow rate from a one-year, one-hour storm. Alternative BMPs shall be submitted to the Regional Water Board for approval.

c. Plastics Facilities shall use durable sealed containers designed not to rupture under typical loading and unloading activities at all points of plastic transfer and storage.

d. Plastics Facilities shall use capture devices as a form of secondary containment during transfers, loading, or unloading Plastic Materials. Examples of capture devices for secondary containment include, but are not limited to catch pans, tarps, berms or any other device that collects errant material.

e. Plastics Facilities shall have a vacuum or vacuum-type system for quick

COMPLAINT                                          14

cleanup of fugitive plastic material available for employees.

    f.  Pursuant to Water Code section 13367(e)(1), Plastics Facilities that handle Plastic Materials smaller than 1mm in size shall develop a containment system designed to trap the smallest plastic material handled at the facility with a treatment capacity of at least the peak flow rate from a one-year, one-hour storm or develop a feasible alternative BMP or suite of BMPs that are designed to achieve a similar or better performance standard that shall be submitted to the Regional Water Board for approval. General Permit § XVIII(A)(1).

48. The General Permit exempts Plastics Facilities from the Water Code requirement to install a containment system if (1) the discharger has submitted a valid "No Exposure Certification" to the State Water Board's electronic SMARTS database or (2) has implemented the following eight BMPs:

1. Plastics Facilities shall annually train employees handling Plastic Materials. Training shall include environmental hazards of plastic discharges, employee responsibility for corrective actions to prevent errant Plastic Materials, and standard procedures for containing, cleaning, and disposing of errant Plastic Materials.

2. Plastics Facilities shall immediately fix any Plastic Materials containers that are punctured or leaking and shall clean up any errant material in a timely manner.

3. Plastics Facilities shall manage outdoor waste disposal of Plastic Materials in a manner that prevents the materials from leaking from waste disposal containers or during waste hauling.

4. Plastics Facilities that operate outdoor conveyance systems for Plastic Materials shall maintain the system in good operating condition. The system shall be sealed or filtered in such a way as to prevent the escape

of materials when in operation. When not in operation, all connection points shall be sealed, capped, or filtered so as to not allow material to escape. Employees operating the conveyance system shall be trained how to operate in a manner that prevents the loss of materials such as secondary containment, immediate spill response, and checks to ensure the system is empty during connection changes.

5. Plastics Facilities that maintain outdoor storage of Plastic Materials shall do so in a durable, permanent structure that prevents exposure to weather that could cause the material to migrate or discharge in storm water.

6. Plastics Facilities shall maintain a schedule for regular housekeeping and routine inspection for errant Plastic Materials. The Plastics Facility shall ensure that their employees follow the schedule.

7. PRDs shall include the housekeeping and routine inspection schedule, spill response and prevention procedures, and employee training materials regarding plastic material handling.

8. Plastics Facilities shall correct any deficiencies in the employment of the above BMPs that result in errant Plastic Materials that may discharge or migrate off-site in a timely manner. Any Plastic Materials that are discharged or that migrate off-site constitute an illicit discharge in violation of this General Permit. General Permit § XVIII(A)(2)(b).

**Numeric Action Levels**

49.    The General Permit establishes annual Numeric Action Levels ("NALs") and instantaneous maximum NALs. The following annual NALs have been established under the General Permit for pollutants applicable to the Facility: total suspended solids ("TSS") – 100 mg/L; oil and grease ("O&G") – 15 mg/L; zinc – 0.26 mg/L; and copper – 0.0332 mg/L. The General Permit also established the following instantaneous Maximum NALs applicable to the Facility: TSS – 400 mg/L; and O&G

– 25mg/L.

50.    The General Permit requires that a Discharger compare the results of its storm water discharge samples to the adopted annual NALs and instantaneous maximum NALs. General Permit § XII.A. An exceedance of an annual NAL occurs when the average of the analytical results for a pollutant obtained for all samples at the entire facility during a single reporting year is greater than the pollutant's annual NAL. The reporting year runs from July 1 to June 30. An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range (for pH).

51.    If sampling results for a given parameter indicate an NAL exceedance for that same parameter, the Discharger attains "Level 1 status," which commences on July 1 following the reporting year during which the exceedance occurred. General Permit § XII.C.

52.    By October 1 following commencement of Level 1 status, the Discharger must complete a Level 1 Exceedance Response Action ("ERA") Evaluation. General Permit § XII.C.1. As part of the Level 1 ERA Evaluation, the Discharger must "[i]dentify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances." *Id.* No later than January 1 following commencement of Level 1 status, the Discharger must submit via SMARTS a Level 1 ERA Report. General Permit § XII.C.2. The Level 1 ERA report must be prepared by a Qualified Industrial Stormwater Practitioner ("QISP") and must contain "[a] summary of the Level 1 ERA Evaluation" and "[a] detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL." *Id.* A Discharger can move back to Baseline status from Level 1 status only when: (1) a Level 1 ERA report has been

COMPLAINT                                        17

completed; (2) all identified additional BMPs have been implemented; and (3) results from four consecutive QSEs sampled after BMP implementation indicate no additional NAL exceedances for that parameter." *Id.*

53. If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status." General Permit § XII.D. For Level 2 Status, a discharger is required to submit an ERA Action Plan and an ERA Technical Report requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background. General Permit § XII.D. To return to baseline status from Level 2, a discharger must (1) submit an ERA Technical Report that includes an Industrial Activity BMPs Demonstration, (2) implement BMPs to prevent future exceedances for the Level 2 parameter, and (3) obtain sampling results from four subsequent consecutive QSEs that indicate no additional exceedances for that parameter. General Permit § XII.D.4.a.

**Basin Plan**

54. The Regional Board has identified beneficial uses and established water quality standards for the Receiving Waters and has established water quality standards for these waters in the "Water Quality Control Plan for the San Francisco Bay Basin" generally referred to as the Basin Plan.

55. The beneficial uses of these waters include, among others, freshwater replenishment, estuarine habitat, fish migration, preservation of rare and endangered species, fish spawning, wildlife habitat, warm freshwater habitat, cold freshwater habitat, commercial and sport fishing, navigation, industrial service supply, industrial process supply, water contact recreation, and noncontact water recreation. Noncontact water recreation use is defined as "Uses of water for recreational activities involving proximity to water, but not normally involving body contact with water, where

COMPLAINT                                          18

ingestion of water is reasonably possible. These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tide pool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities." Contact recreation includes swimming, wading, water-skiing, skin and scuba diving, surfing, whitewater activities, fishing, and uses of natural hot springs.

56. Discharges of pollutants at levels above water quality standards contribute to the impairment of beneficial uses of the waters receiving the discharge, in violation of the General Permit.

57. The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce other detrimental responses in aquatic organisms."

58. The Basin Plan includes contains a narrative floating material standard which states, "Waters shall not contain floating materials, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses."

59. The Basin Plan includes a narrative oil and grease standard which states, "Waters shall not contain oils, greases, waxes or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses."

60. The Basin Plan includes a narrative settleable materials standard which states, "Waters shall not contain substances in concentrations that result in the deposition of material that cause nuisance or adversely affect beneficial uses."

61. The Basin Plan includes a narrative suspended material standard which states, "Waters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses."

62. The Basin Plan includes a narrative sediment standard which states, "The

COMPLAINT                                         19

suspended sediment load and suspended sediment discharge of surface waters shall not be altered in such a manner as to cause nuisance or adversely affect beneficial uses."

63.    The Basin Plan contains a taste and odor standard that states, "Waters shall not contain taste- or order-producing substances in concentrations that impart undesirable tastes or odors to fish flesh or other edible products or aquatic origin, that cause nuisance, or that adversely affect beneficial uses."

64.    The Basin Plan contains a turbidity standard that states "Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses."

65.    The Basin Plan establishes a Marine Water Quality Objective for zinc of 0.081 mg/L (4-day average) and 0.090 mg/L (1-hour average). The EPA has adopted the same saltwater numeric water quality standards for zinc of 0.090 mg/L (Criteria Maximum Concentration – "CMC") and 0.081 mg/L (Criteria Continuous Concentration – "CCC") and freshwater numeric water quality standards for zinc of 0.120 mg/L (CMC). 40 C.F.R. 131.38 (California Toxics Rule ["CTR"]).

66.    The Basin Plan establishes a Water Quality Objective for Suisun Bay for copper of 0.006 mg/L (4-day average) and 0.0094 mg/L (1-hour average). The EPA has adopted saltwater numeric water quality standards for copper of 0.0048 mg/L (CMC) and 0.0031 mg/L (CCC) and freshwater numeric water quality standards for copper of 0.013 mg/L (CMC) and 0.009 mg/L (CCC). 40 C.F.R. 131.38 (CTR).

67.    Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements. 33 U.S.C. §§ 1365(a)(1) and (f), § 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $68,445 per day per violation, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365. *See also* 40 C.F.R. §§ 19.1 - 19.4.

## V.    STATEMENT OF FACTS

### The Facility

68.    Defendants own and/or operate the Macro Plastics Facility ("Facility), located at 2250 Huntington Drive, Fairfield, California 94533.

69.    The Facility manufactures a variety of plastic bins used for transporting fruits, vegetables, and other commodities.

70.    The Facility engages in the use of polyethylene and polypropylene to manufacture plastic bins. Industrial processes occurring at the Facility include the offloading of plastic beads from railroad cars, molding plastics beads into boxes, grinding old plastic boxes into small beads for reuse, and supplying hydraulic oil to the molding machinery.

71.    The State Board's electronic SMARTS database lists the current Facility Waste Discharge Identification ("WDID") number as 2 48I026804.

72.    The Facility operates 24 hours per day, seven days per week.

73.    Plaintiff is informed and believes, and thereupon alleges that, Defendants have operated the Facility since at least September 13, 2016.

74.    Plaintiff is informed and believes, and thereupon alleges that, on or about September 13, 2016, Defendants filed their Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI"), enrolling the Facility in the General Permit.

75.    Plaintiff is informed and believes, and thereupon alleges that, on or about April 2, 2024, Defendants filed their most recent NOI.

76.    The most recent NOI lists the Facility's SIC code as 3082 ("Unsupported Plastics Profile Shapes").

77.    The Facility collects stormwater from its 13-acre industrial site and discharges storm water from at least three discharge locations at the Facility.

78.    Storm water from these drainage areas flow into the City of Fairfield's

sewer line and local drainage channels, both of which discharged into the McCoy Basin, which drains to McCoy Creek, which flows into Laurel Creek and ultimately drains to the Suisun Marsh, then Grizzly Bay and Suisun Bay.

79.    The McCoy Basin, McCoy Creek, Laurel Creek, Suisun Marsh, Grizzly Bay and Suisun Bay are waters of the United States.

80.    Plaintiff is informed and believes, and thereupon alleges that storm water flows over the surface of the Facility where industrial activities occur.

81.    Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects particulates and metals including TSS, copper, O&G, and zinc, and other pollutants as it flows towards the storm water discharge locations.

82.    Plaintiff is informed and believes, and thereupon alleges that all storm water discharges from the Facility contain storm water that is commingled with runoff from areas at the Facility where industrial processes occur.

**Discharges in Violation of Permit and Violations of the General Permit's Requirement for BMPs that achieve BAT and BCT.**

83.    Plaintiff alleges that Defendants have not implemented BMPs that achieve BAT/BCT at the Facility.

84.    Plaintiff alleges that storm water discharges from the Facility contain concentrations of pollutants with exceedances of annual NALs.

85.    The levels of TSS in storm water detected at the Facility have exceeded the annual NAL for TSS of 100 mg/L established by the General Permit. During the 2023-2024 Reporting Year, the average level of TSS measured in the storm water samples collected at the Facility was 312 mg/L. During the 2022-2023 Reporting Year, the average level of TSS measured in the storm water samples collected at the Facility was 100.1 mg/L. Each of these average annual levels exceed the annual NAL for TSS.

86.    The levels of copper in storm water detected at the Facility have

COMPLAINT                                                      22

exceeded the annual NAL for copper of 0.0332 mg/L, the CTR value for copper of 0.0048 mg/L, and the 1-hour average water quality standard for copper of 0.0094 mg/L established by the General Permit, EPA, and Basin Plan. During the 2023-2024 Reporting Year, the average level of copper measured in the storm water samples collected at the Facility was 0.0958 mg/L. During the 2022-2023 Reporting Year, the average level of copper measured in the storm water samples collected at the Facility was 0.1982 mg/L. Each of these average annual levels exceed the annual NAL, CTR value, and Basin Plan water quality standard for copper.

87.     Storm water samples collected at the Facility demonstrate that discharges from the Facility contain concentrations of copper that cause or contribute to a violation of the applicable water quality standard in the CTR. For example, storm water samples collected at the Facility on February 19, 2024, January 10, 2024, December 27, 2022, and November 8, 2022, all contained concentrations of copper at levels which exceed the CMC of 0.0048 mg/L for copper set forth in the CTR.

88.     The levels of copper in storm water detected at the Facility have exceeded the 1-hour average water quality standard for copper of 0.0094 mg/L established in the Basin Plan. For example, storm water samples collected at the Facility on February 19, 2024, January 10, 2024, December 27, 2022, and November 8, 2022, all contained concentrations of copper at levels which exceed the 1-hour average water quality standard for copper of 0.0094 mg/L set forth in the Basin Plan.

89.     The levels of zinc in storm water detected at the Facility have exceeded the annual NAL for zinc of 0.26 mg/L and the 1-hour average water quality standard for zinc of 0.090 mg/L established by the General Permit and Basin Plan. During the 2023-2024 Reporting Year, the average level of zinc measured in the storm water samples collected at the Facility was 0.6 mg/L. During the 2022-2023 Reporting Year, the average level of zinc measured in the storm water samples collected at the Facility was 0.4 mg/L. Each of these average annual levels exceed the annual NAL and Basin

COMPLAINT                                23

Plan water quality standard for zinc.

90.    The levels of zinc in storm water detected at the Facility have exceeded the 1-hour average water quality standard for zinc of 0.090 mg/L established in the Basin Plan. For example, storm water samples collected at the Facility on February 19, 2024, January 10, 2024, December 27, 2022, and November 8, 2022, all contained concentrations of zinc at levels which exceed the 1-hour average water quality standard for zinc of 0.090 mg/L set forth in the Basin Plan.

91.    The levels of O&G in storm water detected at the Facility have exceeded the annual NAL for O&G of 15 mg/L established by the General Permit. During the 2022-2023 Reporting Year, the average level of O&G measured in the storm water samples collected at the Facility was 337.5 mg/L. This average annual level exceeds the annual NAL for O&G.

92.    On information and belief, Plaintiff alleges that the Facility's ongoing discharges of storm water with pollutants in excess of applicable NALs and CMC values demonstrate that the Defendants have failed and continue to fail to develop and/or implement BMPs that comply with the General Permit's BAT/BCT standards. Based on the pollutant levels in the Facility's storm water discharges, the BMPs implemented to date at the Facility do not represent BAT and BCT.  A treatment system or other additional advanced BMPs are available that can be feasibly installed and operated at the Facility. As of the date of this Complaint, Defendants have failed to implement minimum BMPs and advanced BMPs that achieve BAT and BCT.

### Violations of Special Requirements for Plastic Materials.

93.    Plaintiff is informed and believes, and thereupon alleges, that Plastic Materials are handled at the Facility as that term is defined in the General Permit.

94.    Plaintiff is informed and believes, and thereupon alleges, that the Facility has not implemented an adequate containment system for Plastic Materials or alternate suite of eight BMPs, as required by the General Permit.

COMPLAINT                                              24

95. On March 27, 2024, an inspection of the Facility was conducted by the Regional Water Board. Thereafter, on July 18, 2024, the Regional Water Board issued a Notice of Violations, stating that the Facility failed to identify and clean up spills of plastic pellets and shredded plastic pieces, failed to adequately contain plastic pellets, and failed to maintain storm drain inlet filters in violation of Section XVIII(A) of the General Permit.

96. Plaintiff is informed and believes, and thereupon alleges, that the Facility is in violation of Section XVIII(A) of the General Permit for failure to maintain good housekeeping, failure to adequately response to spills and leaks, and failure to implement an adequate containment system for Plastic Materials leading to the discharge of plastic pellets each time the Facility discharges storm water.

97. Plaintiff is informed and believes, and thereupon alleges, that the Facility is in violation of Section XVIII(A)(1)(f) of the General Permit for failure to provide information in the Facility's SWPPP describing how the Facility handles and contains Plastic Materials smaller than 1mm in size coming from industrial activities such as plastic grinding.

**Violation of Requirement to Prepare, Implement, Review and Update an Adequate Storm Water Pollution Prevention Plan.**

98. Plaintiff alleges that Defendants have failed and continue to fail to adequately develop, implement, and/or revise the Facility's SWPPP in violation of SWPPP requirements of the General Permit.

99. The General Permit requires SWPPPs to identify applicable advanced BMPs that are not being implemented at the Facility and provide a justification for their exclusion. General Permit, § X(H)(4)(b). Given the ongoing high levels of TSS, copper, zinc, and O&G measured in the Facility's discharge, in order to comply with the General Permit's BAT/BCT requirement, the Facility's SWPPP must identify additional advanced BMPs necessary to implement the BAT/BCT requirements and

achieve the NALs, and explain why available BMPs are not being implemented at the Facility. Defendants are violating Section X(H)(4)(b) because the SWPPP does not identify applicable advanced BMPs that are not being implemented at the Facility and provide a justification for their exclusion.

100.    Information available to Plaintiff indicates that as a result of these practices, storm water containing excessive pollutants is being discharged from the Facility during rain events into the Receiving Waters.

101.    Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed and continue to fail to alter the Facility's SWPPP and site-specific BMPs consistent with the General Permit. Information available to Plaintiff indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water. Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuous.

**Violations of Monitoring Requirements.**

102.    Plaintiff alleges that Defendants have been conducting, and continue to conduct, operations at the Facility with an inadequately developed, implemented, and/or improperly revised Monitoring Implementation Plan.

103.    Plaintiff is informed and believes and thereupon alleges that Defendants have failed and continues to fail to collect and analyze storm water discharge samples from all outfalls for all pollutants during all QSEs as required by Section XI(B)(3) of the General Permit. During the 2024-2025 reporting year, the Facility failed to collect and analyze samples from two required QSEs during each half of the reporting year. During the 2021-2022 reporting year, the Facility failed to collect and analyze samples from two required QSEs during each half of the reporting year. During the 2020-2021 reporting year, the Facility failed to collect and analyze samples from two required QSEs during each half of the reporting year.

COMPLAINT                                    26

104.    Plaintiff is informed and believes and thereupon alleges that precipitation data obtained from the National Oceanic and Atmospheric Administration or City of Fairfield demonstrates that there were QSEs at the Facility during the past several Reporting Years that Defendants failed to monitor. *See* Notice Letter, p. 16.

105.    As a result, Plaintiff is informed and believes and thereupon alleges that Defendants have violated Section XI(B)(2) by failing to take the requisite samples from Qualifying Storm Events. On information and belief, Plaintiff alleges the Facility would have had additional exceedances of NALs and water quality standards had it sampled all required QSEs.

106.    Information available to Plaintiff indicates that as a result of these practices, storm water containing excessive pollutants is being discharged from the Facility during rain events into the Receiving Waters.

107.    Information available to Plaintiff indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water. Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuous.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Failure to Implement the Best Available and
### Best Conventional Treatment Technologies
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

108.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

109.    The General Permit's SWPPP requirements and Effluent Limitation

V(A) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. Defendants have failed to implement advanced BMPs and BAT and BCT at the Facility for its discharges of TSS, copper, zinc, and O&G, and other potentially un-monitored pollutants in violation of Effluent Limitations V.A and X.H of the General Permit.

110.   Each day since October 5, 2020 that Defendants have failed to develop and implement advanced BMPs and BAT/ BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

111.   Defendants have been in violation of the BMP and BAT/BCT requirements every day since at least October 5, 2020. Defendants continue to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement BAT/BCT at the Facility.

## SECOND CAUSE OF ACTION

**Failure to Comply with Special Requirements for Plastic Materials**

**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

112.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

113.   Section XVIII establishes Special Requirements for facilities that handle Plastic Materials.

114.   Defendants have failed to meet these Special Requirements, which is evidenced by, *inter alia*:

a. Defendants' failure to implement an adequate containment system for Plastic Materials; or

b. Defendants' failure to implement an alternate suite of eight BMPs; and

COMPLAINT                                                            28

   c.  Defendants' failure to maintain good housekeeping;

   d.  Defendants' failure to adequately respond to spills and leaks;

   e.  Defendants' failure to update the Facility's SWPPP describing how the Facility handles and contains Plastic Materials smaller than 1mm in size.

115.  Defendants have been in violation of the Permit's Special Requirements for Plastic Materials every day since October 5, 2020. Defendants continue to be in violation of these requirements each day they fail to develop and fully implement the required BMPs and SWPPP updates in accordance with the Special Requirements.

**THIRD CAUSE OF ACTION**

**Failure to Prepare, Implement, Review, and Update**

**an Adequate Storm Water Pollution Prevention Plan**

**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

116.  Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

117.  Section X of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP.

118.  Defendants have failed to develop and implement an adequate SWPPP for the Facility. Defendants' ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*:

   a.  Defendants' failure to identify advanced BMPs at the Facility;

   b.  Defendants' failure to justify the exclusion of advanced BMPs at the Facility.

119.  Defendants have been in violation of the Permit's SWPPP requirements every day since October 5, 2020. Defendants continue to be in violation of the SWPPP requirements each day they fail to develop and fully implement an adequate SWPPP for the Facility.

## FOURTH CAUSE OF ACTION

**Failure to Develop and Implement an**

**Adequate Monitoring Implementation Plan**

**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

120.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

121.   The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges).

122.   Defendants have failed to develop and implement an adequate Monitoring Implementation Plan for the Facility. General Permit, §§ X(I), XI. Defendants' ongoing failure to develop and implement an adequate Monitoring Implementation Plan for the Facility is evidenced by their failure to conduct required sampling and analysis, and failure to comply with the requirements of General Permit Attachment H when handling and preserving storm water samples since at least October 5, 2020.

123.   Each day since at least October 5, 2020, that Defendants have failed to develop and implement an adequate Monitoring Implementation Plan for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

## FIFTH CAUSE OF ACTION

**Discharges of Contaminated Storm Water**

**in Violation of Permit Conditions and the Act**

**(Violations of 33 U.S.C. §§ 1311, 1342)**

124.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

COMPLAINT                                         30

125.   Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI.A and Discharge Prohibition III.D of the General Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

126.   Plaintiff is informed and believes, and thereupon alleges, that since at least October 5, 2020, Defendants have been discharging polluted storm water from the Facility in excess of the applicable water quality standards for copper and zinc in violation of Receiving Water Limitation VI.A and Discharge Prohibition III.D of the General Permit.

127.   During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with copper and zinc at levels above applicable water quality standards. The storm water from the Facility ultimately flows into the Receiving Waters.

128.   Plaintiff is informed and believes, and thereupon alleges, that the Facility's discharges of storm water containing copper in excess of 0.0048 mg/L and 0.0094 mg/L and zinc in excess of 0.090 mg/L are causing or contributing to the violation of the applicable water quality standards in the CTR and the Basin Plan in violation of Receiving Water Limitation VI.A and Discharge Prohibition III.D of the General Permit.

129.   Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation VI.B of the General Permit.

COMPLAINT                                          31

130. Every day since at least October 5, 2020 that Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

## VII.   RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a. Declare Defendants to have violated and to be in violation of the Act as alleged herein;

b. Enjoin Defendants from discharging polluted storm water from the Facility unless authorized by the General Permit;

c. Enjoin Defendants from further violating the substantive and procedural requirements of the General Permit;

d. Order Defendants to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e. Order Defendants to immediately implement storm water pollution control and treatment technologies and measures that prevent pollutants in the Facility's storm water from contributing to violations of any NALs, and water quality standards;

f. Order Defendants to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

g. Order Defendants to prepare a SWPPP for the Facility consistent with the General Permit's requirements and implement procedures to regularly review and update the SWPPP;

h. Order Defendants to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts

COMPLAINT                                              32

to comply with the Act and the Court's orders;

i.    Order Defendants to pay civil penalties of up to $68,445 per day per violation, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

j.    Order Defendants to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

k.    Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

l.    Award any such other and further relief as this Court may deem appropriate.

Dated: December 4, 2025          Respectfully submitted,

By:    /s/ *Rebecca L. Davis*
       Rebecca L. Davis
       LOZEAU DRURY LLP
       Attorneys for Los Angeles Waterkeeper